# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

STACEY MONTGOMERY                                          PLAINTIFF
ADC #164027

V.                              No. 4:18CV00484-JTR

KERRY NEWBURN, Deputy;
and TRAVIS RIGGS, Officer,
Pulaski County Jail                                        DEFENDANTS

## OPINION AND ORDER[1]

Plaintiff Stacey Montgomery ("Montgomery") alleges § 1983 claims against:

(1) Defendant Pulaski County Deputy Kerry Newburn ("Newburn") for using

excessive force; and (2) Defendant Pulaski County Deputy Travis Riggs ("Riggs")

for failing to protect him from that use of excessive force by Newburn. Both of those

claims arise from an incident that took place on February 5, 2018, in the prisoner

holding cells in the Pulaski County courthouse. *Doc. 1.*

Defendants have filed a Motion for Summary Judgment, a Brief in Support, a

Statement of Facts, and two Replies. *Docs. 38, 39, 40, 51 & 56.* They argue that:

(1) qualified immunity shields them from liability for damages on the § 1983 claims

Montgomery has asserted against them in their individual capacity; and (2)

---

[1]The parties have consented to proceed before a United States Magistrate Judge. *Doc. 25.*

Montgomery's claims against them, in their official capacity, fail because his alleged injuries did not result from their violation of any policy or custom.

In support of their Motion, Defendants have submitted: (1) an Affidavit of Lesa Warner, Administrative Sergeant at the Pulaski County Regional Detention Facility ("PCRDF") (*Doc. 40, Ex. 1*); (2) Montgomery's Plea Statement and PCRDF Book-In Sheet (*Id., Exs. 1-1 & 1-2*); (3) relevant Pulaski County Sheriff's Office policies (*Id., Exs. 1-3 & 1-4*); (4) Incident Reports regarding the February 5, 2018 incident, written by Newburn and Deputy Jernizia Gibbs (*Id., Exs. 1-5 & 1-6*); (5) a February 6, 2018 Incident Report prepared by Sergeant George Clarke (*Id., Ex. 1-9*); (6) Montgomery's relevant medical records (*Id., Exs. 1-7 & 1-10*); (7) Montgomery's Grievance No. 18-161 (*Id., Ex. 1-8*); (8) an Official Memorandum, dated February 23, 2018, prepared by Lieutenant Jason Bangs (*Id., Ex. 1-11*); (9) two photographs of Montgomery taken on February 6, 2018*;* and (10) two videos from Camera 4 that capture the entire incident giving rise to Montgomery's claims against Defendants.[2]

Montgomery has filed several Responses opposing summary judgment. *Docs.*

---

[2]Defendants initially submitted only one video from "Camera 4," which showed only part of the incident between Montgomery and Newburn. *Doc. 16 (sealed).* They later submitted a second video with additional footage from Camera 4. *Doc. 41 (sealed).* The parties agree that these two videos show *the entire incident* that occurred in the courthouse holding area on February 5, 2018. *See Doc. 42 at 1-2.* The relevant portions of the video footage from Camera 4 are for the intervals of time between 12:15 p.m. and 1:15 p.m. ("Video 1") and 1:10 p.m. to 2:05 p.m. ("Video 2").

*47, 52, 53 & 57.* In addition to relying on other materials in the record, Montgomery

has also submitted: (1) his sworn Declaration, dated August 22, 2019 (*Doc. 52 at 4-*

*6);* (2) a computer-generated report of the February 5, 2018 incident (*Doc. 52, Ex.*

*2);* and (3) additional medical records (*Id., Ex. 3).* He has also filed a Motion for

Appointment of Counsel to represent him in this case. *Doc. 58.*

Thus, the issues are joined and Defendants' Motion for Summary Judgment

is ready for disposition.[3]

## I. Facts

The facts relevant to Montgomery's claims are set forth below.

1.     On August 3, 2017, Montgomery pleaded guilty to two counts of

aggravated assault on a correctional or law enforcement officer. *Doc. 40, Ex. 1 ¶ 5*

(Warner Aff.), & *Ex. 1-1* (Plea Statement); *State v. Montgomery,* Pul. Co. Cir. Ct.

No. CR 2016-3237 (electronically accessed at https://caseinfo.arcourts.gov). At that

time, he was already incarcerated in the Arkansas Division of Correction ("ADC"),

serving multiple sentences in other cases. *See* https://adc.arkansas.gov (Inmate

---

[3]Summary judgment is appropriate when the record, viewed in a light most favorable to
the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the
moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp.
v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50
(1986). The moving party bears the initial burden of demonstrating the absence of a genuine
dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present
specific facts demonstrating that there is a material dispute for trial. *See* Fed. R. Civ. P. 56(c);
*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

Search).

2.      On February 4, 2018, Montgomery was transported from the ADC to the PCRDF to await his sentencing, which was scheduled for the next day. *Doc. 40, Ex. 1-2* (PCRDF Book-In Sheet)*; see State v. Montgomery, supra*.

3.      On February 5, 2018, Montgomery was transported from the PCRDF to the Pulaski County courthouse. After his sentencing, he was placed in the "holding area" or "lock-up," awaiting transport back to the PCRDF. *Doc. 52 at 4* (Montgomery Decl.). Newburn and Riggs were working as "transport deputies" for the PCRDF. Their duties included transporting PCRDF inmates to and from court proceedings, as well as supervising inmates in the holding area. *Doc. 40, Ex. 1 ¶ 10; Doc. 26-4 at 6 & 10* (Defs.' Resp. to Interrogs.).

4.      At about 1:00 p.m. on February 5, Newburn was "downsizing" the cells in the holding area to make room for other prisoners. *Doc. 40, Ex. 1-5* (Newburn Incident Report). Newburn removed Montgomery and three other prisoners from one cell to move them down the hall to the "ADC holding cell." Montgomery was already in handcuffs and leg irons and, once he was in the hallway, Newburn placed a belly chain and a "black box" on him.[4] *Id.; Doc. 26-4 at 7; Doc. 52 at 4; Video 1*

---

[4]According to Montgomery, the black box covered the keyhole portion of the handcuffs and was connected to the belly chain. There was a chain connecting the leg irons and handcuffs, which was also connected to the belly chain. He refers to this as being in "four-point restraints." *Doc. 53 at 8.*

*at 01:07:11 to 01:08:12.*

5. As Newburn was moving the prisoners, Montgomery began yelling at a female prisoner in the hallway. Newburn ordered him to "cease the noise" and keep walking toward the ADC holding cell. *Doc. 40, Ex. 1-5.* Montgomery admits that he was yelling and that Newburn told him to be quiet. *Doc. 53 at 1.*

6. According to Newburn's Incident Report, Montgomery then cursed him and called him a racial epithet. Newburn continued using a "soft open hand" to guide Montgomery to the holding cell. Newburn reported that Montgomery then threatened several times to "fuck [Newburn] up" if he took Montgomery's cuffs off or if Newburn "ever came to Varner Unit." *Doc. 40, Ex. 1-5.*

7. According to Incident Reports from Newburn and Deputy Jernizia Gibbs ("Gibbs"), as Newburn tried to guide Montgomery into the cell, Montgomery "snatched away" from him. *Doc. 40, Exs. 1-5 & 1-6.*[5] Newburn stated that he then pushed Montgomery's back up against the wall to gain control of him. Gibbs ran over to assist. Newburn handed his keys to her, and she told him to step back "to defuse the situation." Gibbs then walked Montgomery into the cell and secured the

---

[5]Newburn's computer-generated incident report stated that Montgomery "snatched *towards*" him. *Doc. 52 at 8.* This discrepancy is not material.

cell door without further incident. *Id.* [6]

8.    In his sworn Declaration, Montgomery admits that he cursed Newburn, but asserts that he did not physically resist Newburn's efforts to lead him into the cell. *Doc. 52 at 4.* He asserts that, after he cursed Newburn, he grabbed and painfully squeezed Montgomery's arm and neck, spun him around so they were face to face, and slammed him back against the wall. According to Montgomery, Newburn then banged his head against the wall for "over one minute,"[7] choked his neck, and yelled "Who's the bitch ass nigga now?"[8] He asserts that when Gibbs arrived, she told Newburn several times to "calm down," to let go of Montgomery's neck, and to step back. Newburn then released Montgomery and Gibbs escorted him into the cell. *Id. at 4-5; see also Doc. 1 at 5* (Pl.'s Complt.).

---

[6]In her Incident Report, Gibbs stated that she heard Montgomery cursing Newburn, ran over to assist, was handed the keys by Newburn, walked Montgomery in the cell, and secured the cell cage door. *Doc. 40, Ex. 1-6.* Her report also states that Newburn "pushed [Montgomery] against the back wall to gain positive control" after Montgomery tried to "pull away" from him. *Id.*

[7]In a grievance Montgomery filed a few hours after the incident, he stated that Newburn had "choked" him and "bang[ed] [his] head against the wall repeatedly for *at least 30-40 seconds*." *Doc. 40, Ex. 1-8* (emphasis added). In Montgomery's verified § 1983 Complaint, filed on July 6, 2018, he said Newburn "wrapped his right hand around [Montgomery's] neck and shoved [him] 3 feet into the wall and began to brutally bang [his] head into the wall … [for] *over 1 minute*." *Doc. 1 at 5* (emphasis added). In his sworn Declaration dated August 22, 2019, Montgomery said Newburn "bang[ed] his head on the wall *several times* and chok[ed] him about the neck," but does not say how long the incident lasted. *Doc. 52 at 4.* Montgomery's changing accounts of what happened during the incident and how long he was subjected to Newburn's alleged use of excessive force seriously undermine the credibility of his claims.

[8]Both Newburn and Montgomery are African Americans.

9.      Camera 4 shows only Riggs in close proximity to Newburn during the time Montgomery alleges Newburn choked him and repeatedly banged his head against the wall. *Video 1 at 01:09:00 to 01:10:17.*

10.      Riggs admitted that he was present and witnessed the incident between Newburn and Montgomery, but said he was "not personally involved" and did not prepare an incident report. *Doc. 26-4 at 11* (Riggs's Resp. to Interrog. Nos. 4-6); *Doc. 37 at 30* (Riggs's Resp. to Req. Admiss. Nos. 1-2).

11.      The video of the incident shows, at 1:07 p.m., Newburn and Riggs placing chains on four prisoners and walking them toward the ADC holding cell at the end of the hallway. *Video 1 at 01:07:11 to 01:09:43.* The video makes it clear that Newburn is a very large and powerfully built man, who is bigger than Montgomery.

12.      At 1:09 p.m., all of the prisoners, except Montgomery, have either walked inside the ADC holding cell or are walking through the cell doorway. As the last prisoner in the line, Montgomery is still several feet away from the holding cell. Newburn is standing with his back to the camera waiting for Montgomery to enter the cell. The video shows Montgomery jerk to the right instead of turning left to enter the cell. Newburn follows Montgomery and pins him against the back wall. For the next nine or ten seconds, Newburn can be seen trying to control Montgomery, whose back appears to be against the wall on the right side of the

hallway. *Video 1 at 01:09:43 to 01:09:59.*

13.    At 1:10 p.m., Montgomery appears to be still pinned against the back wall. Newburn and Riggs are in front of him, with their backs to the camera. An open cell door makes it difficult to see everything that is taking place between Newburn and Montgomery. They appear to be shoving each other as Montgomery tries to push himself off the wall and Newburn pushes back to maintain his position of control until other officers arrive. One thing is clear, however, Newburn's arms and hands never rise above his shoulders, which would have been *necessary* for Newburn to grab Montgomery around the throat or bang his head against the wall, as Montgomery alleges in his pleadings.

14.    After about ten seconds, Newburn moves to the left and Riggs leads Montgomery toward the holding cell door. Montgomery has his hands behind his back, but he is jerking and resisting. Gibbs and another officer approach the holding cell, and Montgomery turns and attempts to strike in the direction of Newburn as the cell door closes. *Videos 1 & 2 at 01:10:00 to 01:12:45.*

15.    In his sworn Declaration, Montgomery states that, when Gibbs arrived, he told her that his neck and head were hurt and that he needed medical attention. When he arrived back at the PCRDF, he was immediately taken to a medical examination room. *Doc. 52 at 5.*

16.    At 2:52 p.m., a nurse examined Montgomery. According to

8

Montgomery, he showed the nurse red marks on his neck, and told him that his head was sore and tender. In his treatment notes, the nurse stated "*no visible marks noted upon inspection*" and "*no reaction when touching supposed affected area of head.*" *Id. at 5 & 29* (Nursing Progress Notes) (emphasis added). The nurse also completed a "Medical Communication Form," stating that "*no injury [was] complained of or observed*," and that Montgomery was "*medically cleared to remain in unit.*" *Doc. 40, Ex. 1-7* (emphasis added).

17.     *Nothing* in Video 1 and Video 2 supports Montgomery's claim that Newburn choked him and violently banged his head against the wall, much less that he did so for "30-40 seconds" *or* "over one minute." Given Newburn's size and strength, him violently banging Montgomery's head against the wall one or more times would have likely rendered Montgomery unconscious and would have left considerable swelling and a contusion on the back of Montgomery's head. Similarly, Newburn wrapping his hand around Montgomery's throat and neck and choking him would have left easily discernable finger marks and bruising. In other words, there would have been nothing subtle about the injuries Montgomery would have sustained from such a use of force by Newburn.

18.     The notes of the nurse who examined Montgomery, immediately after the incident, do *not* document *any* marks or injuries to Montgomery's neck or head. This undisputed medical evidence is entirely consistent with the video of the incident

and makes it clear Montgomery has fabricated his claims against Newburn.

19.    Later that day, Montgomery filed a grievance, alleging that Newburn "choked" him and "bang[ed] [his] head against the wall repeatedly for at least 30-40 seconds." He complained that he was unable to turn his neck and had a "major headache." He asked that photos be taken of his neck. *Doc. 40, Ex. 1-8.*

20.    According to Montgomery, he complained to officers throughout the evening that he had a headache, was dizzy, and had a sore neck and throat. Shortly after midnight, Montgomery told Sergeant George Clarke ("Clarke") that his neck was hurting and he needed medical attention. A nurse spoke to Montgomery through his cell door and told him to fill out a sick call form so that he could be seen. *Doc. 52 at 5-6; Doc. 40, Ex. 1-9* (Clarke Incident Report).

21.    At 4:10 a.m. on February 6, 2018, Montgomery was taken to the dayroom where Clarke took photos of his neck, but said he could not see any visible injuries. *Doc. 40, Ex. 1-9; see also Doc. 36 at 12-13* (photos). At 4:29 a.m., a nurse examined Montgomery. She noted that he complained of neck pain and that she could see "small red marks" on the right back side of his neck.[9] *Doc. 40, Exs. 1-9 &*

---

[9]The previous day, a nurse had examined Montgomery's neck, less than two hours after the incident, and noted he saw *no signs of injury to Montgomery's neck*, something the nurse reported to Montgomery. This suggests "the "small red marks" the nurse observed on the right back side of Montgomery's neck on February 6 may have been created by Montgomery once he was returned to his cell. However, even if those small red marks were the result of Newburn using physical force to control Montgomery, they are consistent with what would be expected from two

*1-10* (Med. Comm. Form)*; Doc. 52 at 30-31* (Nursing Progress Notes)*.* The nurse noted *no bumps or contusions* to the back of Montgomery's head that would be expected if, as Montgomery alleges, Newburn had violently banged his head against the wall. The nurse prescribed ibuprofen for seven days; placed him on "musculoskeletal protocol" with instructions to avoid "strenuous work/activity" until his problem was resolved; told him to follow up with sick if needed; and cleared him to remain in the unit. *Id.*

22.    On February 21, 2018, Lieutenant A. Aldridge prepared an Official Memorandum regarding the February 5 use of force incident. Based on the incident reports, he found no violations of any policies or procedures, standards of conduct, or branch directives. He recommended that the holding area video be "pulled from the courthouse for review if possible," and, "[a]s long as the video does not reveal any discrepancies from the submitted reports," no further investigation would be recommended. *Doc. 36 at 16.*

23.    On February 23, 2018, Lieutenant Jason Bangs reviewed the videos of the incident and prepared an Official Memorandum in which he reached the following conclusion:

> I have reviewed all written documents and video regarding the incident with Inmate Montgomery. I concur with Lieutenant Aldridge's

---

men pushing and shoving each other. *Nothing* about those small red marks is consistent with Newburn choking Montgomery.

assessment that there were no apparent violations of Standards of Conduct, Policy and Procedures or Branch Directives and that no further action is required concerning this incident.

I reviewed this incident on video and it was not in plain view due to being in a corner of lock up. I saw nothing wrong in the video.

*Doc. 40, Ex. 1-11.*

## II. Discussion

Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866-67 (2017) (internal citations omitted). To determine whether an official falls into either of these categories, the Court must ask "whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Id.* at 1867. As long as "a reasonable officer might not have known for certain that the conduct was unlawful," the officer is entitled to qualified immunity. *Id.*

To establish that Defendants are *not* entitled to qualified immunity on Montgomery's individual capacity claims, Montgomery has the burden of demonstrating that: (1) the supported facts, viewed in the light most favorable to

him, show that each Defendant violated his constitutional rights;[10] and (2) those constitutional rights were clearly established such that a reasonable officer would have known that his actions were unlawful. *See Ashcroft v. Al–Kidd*, 563 U.S. 731, 735 (2011); *Pearson v. Callahan,* 555 U.S. 223, 232 (2009); *see also Loch v. City of Litchfield,* 689 F.3d 961, 965 (8th Cir. 2012) (explaining that qualified immunity "shields a government official from liability and the burdens of litigation unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known'").

Montgomery argues that Newburn used excessive force when he suddenly and aggressively slammed Montgomery against the wall, choked him, and repeatedly banged his head against the wall for "over one minute." He contends that, because he was fully restrained, complying with Newburn's orders, and not posing a physical

---

[10]Although the Court must view the facts in a light most favorable to Montgomery, it is not obligated to adopt his otherwise unsupported factual statements if they are "blatantly contradicted" by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Reed v. City of St. Charles, Missouri,* 561 F.3d 788, 790-91 (8th Cir. 2009) (holding that plaintiff may not merely point to unsupported self-serving allegations, but must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor … without resort to 'speculation, conjecture, or fantasy'").

threat, the amount of force used was unnecessary and not applied in a good-faith effort to maintain or restore discipline.[11] *Doc. 1 at 5-6; Doc. 52 at 2; Doc. 53 at 8.*

Defendants argue that Newburn's use of force came only after Montgomery created a disturbance by yelling at a female inmate; refused multiple orders to enter the holding cell; and then jerked away from Newburn as he was trying to guide him into the cell. Thus, they argue that, in pinning Montgomery against the wall until other officers arrived, Newburn applied a reasonable amount of force in a good faith effort to maintain control over Montgomery, in a hallway crowded with other inmates. *Doc. 39 at 4-6; Doc. 51 at 2-3; Doc. 56 at 2-3.*

In evaluating a prisoner's Eighth Amendment excessive force claim, the core judicial inquiry is whether the relevant force was applied in a good-faith effort to maintain discipline, or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). In making that determination, courts must consider: (a) the need for application of force; (b) the relationship between that need and the amount of force used; (c) the threat reasonably perceived by the responsible officials; (d) any efforts made to temper the severity of a forceful response; and (e) the extent of the injury inflicted. *See Ward v. Smith*, 844 F.3d 717,

---

[11]Montgomery also alleges that Newburn's actions were not in compliance with PCRDF policy. However, it is well settled that a defendant's alleged violation of internal prison rules or procedures, standing alone, is not actionable. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003); *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("there is no § 1983 liability for violating prison policy").

721-722 (8th Cir. 2016); *Walker v. Bowersox*, 526 F.3d 1186, 1188 (8th Cir. 2008); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).

Newburn and Montgomery's accounts of the use of force incident are markedly different. However, the video shows that the incident between Newburn and Montgomery lasted for less than twenty seconds and appeared to involve nothing more than pushing and shoving. While the angle and clarity of the videos make it difficult to discern precisely what was taking place between Newburn and Montgomery, there is nothing which suggests Newburn slammed Montgomery's head against the wall and choked him; much less that, as Montgomery alleges, Newburn engaged in that conduct for "30-40 seconds" to "over one minute."

Finally, while Montgomery subjectively complained about injuries to his head and neck, medical personnel, who examined Montgomery shortly after the incident, *saw nothing* consistent with *any injuries* to Montgomery's head and neck. The next morning, an officer took photos of Montgomery's neck and noted "no visible injuries." Another nurse examined Montgomery's neck and noted "small red marks" on the right back side of his neck, which do *not* appear to have been present the previous day. Assuming those "small red marks" were caused by the physical interaction between Newburn and Montgomery (and not created by Montgomery himself to lend some credence to his claim after medical personnel found no marks on his neck immediately after the attack), they would be consistent with Newburn

applying only the limited amount of force necessary to control Montgomery until other officers arrived. Certainly, those small red marks do not support Montgomery's claim that Newburn choked him and banged his head against the wall.

There is nothing in the video of the incident or in the multiple examinations of Montgomery's neck and head, during the fifteen hours after the incident, which support Montgomery's claim that Newburn used *any* excessive force during the incident, much less the enormously excessive force Montgomery alleges, which would have created injuries that would have required medical treatment and possible hospitalization.

Viewing the facts in a light most favorable to Montgomery, no reasonable fact-finder could conclude that Newburn used excessive force against him or engaged in any other conduct that might be deemed a violation of Montgomery's constitutional rights. Because qualified immunity protects Newburn from the excessive force claim Montgomery has asserted against him, in his individual capacity, Newburn is entitled to summary judgment. Accordingly, Montgomery's excessive force claim will be dismissed, with prejudice.

Because Newburn did not use excessive force, no reasonable fact-finder could find liability on the part of Riggs for failing to intervene and protect Montgomery. *See Smith v. Kilgore,* 926 F.3d 479, 486 (8th Cir. 2019). Accordingly, Riggs is also

16

entitled to summary judgment, and Montgomery's failure to protect claim against him will be dismissed, with prejudice.

Finally, without a constitutional violation by the individual officers, there can be no liability on the part of Pulaski County on Montgomery's official-capacity claims. *Smith,* 926 F.3d at 486; *Brewington v. Keener*, 902 F.3d 796, 800 (8th Cir. 2018) (claims against county officers, in their official capacities, "must be treated as [claims] against the County").

Accordingly, Defendants are also entitled to summary judgment on the § 1983 claims Montgomery has asserted against them, in their official capacity, and those claims, as to both Defendants, will be dismissed, with prejudice.

## III. Conclusion

Defendants' Motion for Summary Judgment (*Doc. 38*) is GRANTED, and all of Montgomery's claims are DISMISSED, WITH PREJUDICE. Montgomery's Motion for Appointment of Counsel (*Doc. 58*) is DENIED as moot.

IT IS SO ORDERED this 25th day of March, 2020.

_____
UNITED STATES MAGISTRATE JUDGE